# In the United States Court of Federal Claims

No. 14-720C

(Filed Under Seal: September 29, 2014 | Reissued: October 21, 2014)[*]

|  |  |  |
|---|---|---|
| | ) | |
| BAHRAIN MARITIME & MERCANTILE | ) | |
| INTERNATIONAL BSC (C), | ) | |
| | ) | 28 U.S.C. § 1491(b)(1); Post-award Bid |
| Plaintiff, | ) | Protest; Best-Value Negotiated |
| | ) | Procurement Conducted under FAR Part |
| v. | ) | 15; FAR 15.305; FAR 15.308; Past |
| | ) | Performance; Neutral Rating; Tradeoff; |
| THE UNITED STATES, | ) | RCFC 52.1 |
| | ) | |
| Defendant. | ) | |
| | ) | |

*Thomas P. McLish*, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C., for plaintiff.  With him Of Counsel were *Scott M. Heimberg*, *Robert K. Huffman*, and *Joseph W. Whitehead*.

*Alexis J. Echols*, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With her were *Donald E Kinner*, Assistant Director; *Robert E. Kirschman*, Jr., Director; and *Stuart F. Delery*, Assistant Attorney General.  With them Of Counsel were *Robert Zenjiro Schaper*, Senior Counsel; *Elizabeth Amato*, DLA Counsel-Troop Support.

## OPINION AND ORDER

**KAPLAN, Judge.**

This is a post-award bid protest arising out of an April 28, 2014 decision by the Defense Logistics Agency ("DLA" or "government") to award Ocean Fair International Ship Chandleing ("OFI") a contract to provide food distribution services to the United States military in Bahrain, Qatar, and Saudi Arabia.  The plaintiff in the case is the incumbent contractor, Bahrain Maritime & Mercantile International BSC(C) ("BMMI").  BMMI contends that the award decision was arbitrary and capricious, inconsistent with the terms of the solicitation, and in violation of applicable procurement regulations.  BMMI seeks, among other things, a permanent injunction against the agency proceeding with the award of the contract to OFI, cancellation of the award to OFI, and a new award decision consistent with the Solicitation.

---

[*]This Opinion was originally issued under seal, and the parties were given the opportunity to request redactions.  In light of the parties' suggested redactions, filed on October 10, 2014, the opinion is now reissued with redactions indicated by brackets.

Pending before the Court are the parties' cross motions for judgment on the administrative record, on which oral argument was held on September 15, 2014.  For the reasons explained below, the government's cross motion for judgment on the administrative record is **GRANTED**.

## BACKGROUND[1]

### I.      The Contract Solicitation

DLA supplies food, clothing, medicine, medical supplies and equipment, as well as construction supplies and equipment and related services to the military worldwide.  Def.'s Mot. 3., ECF No. 32.  On October 13, 2010, DLA Troop Support issued a Request for Proposals ("RFP" OR "solicitation") No. SPM300-11-R-0005[2] for two Indefinite Delivery/Indefinite Quantity, Fixed Price with Economic Price Adjustment (EPA) contract(s) "to provide subsistence products to the military and other federally funded customers within" Zone 1 (Qatar, Bahrain, and Saudi Arabia) and Zone 2 (United Arab Emirates, Oman, Djibouti, and Kenya).  AR 1:57–58.[3]

The Zone 1 contract, which is at issue in this case, was for a five year period, consisting of a twenty-four month base period (including a 105-day implementation phase) and two eighteen month option periods.   AR 1:57.[4]  Under the contract, the food distributor would act as a Subsistence Prime Vendor responsible for the supply and delivery of semi perishable and perishable items.  The solicitation provides that:

The prime vendors must be capable of supplying all chilled products, semi perishable food stuffs, frozen fish, meat and poultry, other frozen foods (fruits,

---

[1] The background constitutes findings of fact made by the Court from the administrative record of the procurement filed pursuant to Rules of the Court of Federal Claims ("RCFC") 52.1(a).  See Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (observing that bid protests "provide for trial on a paper record, allowing fact-finding by the trial court").

[2] The RFP was amended 22 times during this procurement.  Except as otherwise noted, citations to the solicitation are to the conformed RFP issued via Amendment 22.  AR 1:1.

[3] Citations to the administrative record refer to the amended record filed on August 25, 2014.  The record is paginated sequentially and also divided into tabs.  In citing to the administrative record, the Court will designate the tab, followed by page number.  For example, AR 1:57 refers to page 57, which is located in Tab 1.

[4] The estimated dollar value of the Zone 1 contract was $336,195,500.00, assuming the base period and all option periods were invoked.  AR 1:77.  The maximum dollar value was 300% of that amount or $1,008,586,500.00 for Zone 1, inclusive of option periods.  Id.  The guaranteed minimum under the contract was 10% of the estimated dollar value per contract period.  Id.

vegetables, prepared foods, etc.), dairy and ice cream products, fresh and frozen bakery products, beverage base & juices (for dispensers), beverages & juices (non-dispenser), fresh fruits and vegetables, non-food items and Government Furnished Material (GFM) such as Unitized Group Rations (UGR's) Meals Ready to Eat (MRE's) Health and Comfort packs (HCP's) and other operational rations items (either currently in existence or to be introduced during the term of this award).

AR 1:57.

## II.   Evaluation Criteria

The solicitation stated that the contract would be awarded to the offeror that provided the best value to the government, utilizing tradeoff source selection procedures as provided in FAR 15.101-1.  AR 1:182.   It further stated that the award would be made to the "responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other non-price factors considered."  AR 1:182.  Furthermore, it stated, "[b]ecause this procurement will use the tradeoff process as outlined in FAR 15.101–1, the Government may accept other than the lowest priced proposal as the overall best value."  AR 1:182.

The Solicitation, as amended after several protests by BMMI (see below), provided that DLA would use the following technical and price factors to evaluate offers:

TECHNICAL PROPOSAL (NON-PRICE FACTORS)

> I.   Distribution System Capability/Quality Assurance
> (Sub-factors[5] A-H are of equal importance and are significantly more important than subfactor I; within sub-factor E, element (E1-Inspection Procedures) is of equal importance to element 2 ( E2-Sanitation Procedures))
>
> > A.   Location and Capacity
> > B.   Resource Availability
> > C.   Airlift Experience
> > D.   Quality Control, Assurance and Warehouse Procedures
> > E.   Inspection and Sanitation Procedure
> > > E1 – Inspection Procedures
> > > E2 – Sanitation Procedures
> > F.   Supplier Selection Procedures
> > G.   Food Defense
> > H.   Surge and Sustainment Capability
> > I.   Key Personnel

---

[5] The solicitation uses the spellings "subfactor," "sub-factor," and "sub factor" in various places. When quoting from the solicitation, the Court will retain the original spelling; otherwise, the Court will use the spelling "subfactor."

3

II. Experience/Past Performance
(Sub-factors A and B are of equal importance to each other and Sub-factors C and D are of equal importance to each other.  Sub factors A and B are more important than Sub factors C and D.)

    A. Experience (Size and Complexity)
    B. Past Performance
    C. Socioeconomic Considerations Past Performance
    D. Ability One (formerly JWOD) Support Past Performance

III. Customer Support/Product Availability
(Sub factors are of equal importance; within sub-factor A (for Factor III) element 1 (A1) is of equal importance to element 2 (A2))

    A. Customer Service Approach
        A1 – Customer Service Approach
        A2 – Customer Service Approach
    B. Product Sourcing
    C. Ordering System
    D. Pipeline

IV. Socioeconomic Considerations
V. Ability One Support
VI. DLA Mentoring Business Agreement (MBA)
VII. Civil Reserve Air Fleet (CRAF)/ Voluntary Intermodal Sealift Agreement (VISA)

BUSINESS PROPOSAL/PRICING (PRICE FACTORS)

I. Aggregate Distribution Price
II. Weighted Aggregate Product Price

AR 1:157–158.

The solicitation explained in detail the relative weight to be given to each of the technical factors with respect to the Zone 1 contract.  In particular, it provided that:

When combined, technical factors I thru VII are more important than price.  However, as proposals become more equal in their technical merit, the evaluated price becomes more important.  Technical Factors I [Distribution-System Capability/Quality Assurance] and II [Experience/Past Performance] are of equal importance and are more important than the remaining technical factors.  Technical Factor III [Customer Support/Product Availability] is more important than Technical Factors IV [Socioeconomic Considerations], V [Ability One Support], VI [DLA Mentoring Business Agreement (MBA)], and VII [Civil Reserve Air Fleet (CRAF)/Voluntary Intermodal Sealift Agreement (VISA)].

4

AR 1:182.[6]

The solicitation detailed how DLA would evaluate each factor and subfactor of an offeror's technical proposal.  AR 1:183-188.   Of particular relevance to this case, the final solicitation explained that "[o]fferors that do not have records of relevant experience, past performance, socioeconomic past performance, and/or Ability One (formerly JWOD) past performance will receive a 'Neutral' rating."  AR 1:187.  It further stated that "[a] 'Neutral' rating is applicable to Sub Factors A, B, C, and D and may be used for the overall Experience/Past Performance factor."  Id.  Consistent with the FAR, the solicitation stated that "[a] neutral evaluation is one that neither rewards nor penalizes offerors without relevant past performance history."  Id.  See FAR 15.305(a)(2)(iv).  It further clarified that "[w]hile a neutral evaluation will not affect an offeror's rating, it may affect the offeror's ranking if a significant number of the other offerors participating in the acquisition have past performance ratings either above or below satisfactory."  AR 1:187.

## III.    Prior Awards, Protests, and Corrective Actions

BMMI filed four protests before the GAO in connection with this Solicitation.  As described in detail below, DLA took corrective actions in response to each of the first three protests, which resulted in their dismissal.  GAO then denied the fourth protest, resulting in this action.

### A.    The September 18, 2012 Award to OFI

The original solicitation closed on January 28, 2011.  AR 32:1204.  In response to the solicitation, the government received nineteen proposals from nine offerors for Zone 1, Zone 2, and combined contingent offers for Zone 1 and 2.  AR 32:1204.  Based on the initial evaluations,

---

[6] The solicitation also stated that:

> Technical Factors IV, V, VI, and VII are factors which are of equal importance to each other and will be ranked on a comparative basis among offerors.  The sub-factors A-H listed under Factor I are of equal importance to each other and are significantly more important than subfactor I; within sub-factor E (for Factor I) element1 (E1-Inspection Procedures) is of equal importance to element 2 (E2-Sanitation Procedures).   For Factor II, sub-factors A and B are of equal importance to each other, and sub-factors C and D are of equal importance to each other; however, sub-factors A and B are more important than factors C and D.  The sub-factors listed under Factor III are of equal importance to each other; within sub-factor A (for Factor III) element 1(A1 – Customer Service Approach) is of equal importance to element 2 (A2 – Customer Service Approach).

AR 1:182 (emphasis in original).

three offerors were determined to be in the competitive range for both zones:  BMMI, OFI, and Seven Seas Shipchandlers LLC ("Seven Seas" or "7SEAS").  AR 32:1692.

On September 18, 2012, DLA awarded the Zone 1 Prime Vendor contract to OFI, the successful offeror.  (Contract No. SPM300-12-D-3594).  AR 108:6026–27; AR 110:6031; AR 111:6114.

According to the Source Selection Decision Document ("SSDD"), BMMI's proposal received an overall technical rating of Excellent and OFI received an overall technical rating of Good.  AR 108:5986.  See AR 113:6122.  BMMI's evaluated price was $90,160,832.04 and OFI's was $77,124,222.59.  Id.

The technical panel's evaluation ratings for the September 18, 2012 award are summarized in the following chart, which includes ratings of Excellent (E), Good (G), Fair (F), Poor (P), and Neutral (N) for each factor and subfactor:[7]

| FACTOR/SUB-FACTOR | BMMI | OFI |
|---|---|---|
| **FACTOR I. Distribution System/Quality Assurance** | **E** | **G** |
| IA.  Location & Capability | G | F |
| IB.  Resource Availability | E | E |
| IC.  Airlift Experience | E | E |
| ID.  Quality Control, Assurance & Warehouse Procedures | E | E |
| IE.  Inspection & Sanitation Procedures | E | G |
| IE1.  Inspection Procedures | E | E |
| IE2.  Sanitation Procedures | E | G |
| IF.  Supplier Selection Procedures | E | E |
| IG.  Food Defense | G | F |
| IH.  Surge and Sustainment Capability | E | E |
| **FACTOR II.  Experience/Past Performance** | **G** | **G** |
| IIA.  Experience | E | P |
| IIA1.  Experience (Size and Complexity) | E | P |
| IIA2.  Experience (Key Personnel) | E | E |
| IIB.  Past Performance | G | E |
| IIC. Socioeconomic Considerations Past Performance | G | N |
| IIID.  Ability One Support Past Performance | P | N |
| **FACTOR III.  Customer Support/Product Availability** | **E** | **E** |
| IIIA.  Customer Service Approach | E | E |

[7] The Source Selection Plan (Addendum dated June 13, 2012) contains a detailed description of the rating scheme and the definition of each rating for each factor, subfactor, and element.  AR 28.

| IIIA1.  Customer Service Approach | E | E |
|---|---|---|
| IIIA2.  Customer Service Approach | E | E |
| IIIB.  Product Sourcing | E | E |
| IIIC.  Ordering System | E | G |
| IIID.  Pipeline | E | E |
| **FACTOR IV.  Socioeconomic Considerations** | 3 | 2 |
| **FACTOR V.  Ability One Support** | 1 | 1 |
| **FACTOR VI.  DLA Mentoring Business Agreement** | 1 | 3 |
| **FACTOR VII.  CRAF/VISA** | 1 | 2 |
| **OVERALL PROPOSAL RATING** | E | G |

AR 108:5986.

As the chart reveals, OFI was ultimately assigned an overall Good rating for Factor II (Experience/Past Performance).  AR 108:5986.  Initially, however, OFI had received an overall rating of Poor on that factor.  The overall Poor rating was based on initial ratings of Poor for Factor II, Subfactor A1 (Experience/Size & Complexity); Excellent on Factor II, Subfactor A2 (Key Personnel); and Neutral ratings on Factor IIB (Past Performance), Factor IIC (Socioeconomic Considerations Past Performance), and Factor IID (AbilityOne Support Past Performance).  AR 37:1825.

The Poor rating on Factor II, Subfactor A1 (Experience/Size and Complexity) was based upon OFI's failure to supply information evidencing that it had experience with contracts of comparable size and complexity to the solicitation's requirements.  AR 37:1825, 1875–77.  Specifically, DLA concluded that a Poor rating was appropriate because although the five contracts OFI submitted "demonstrate the prime contractor's experience delivering various food and non-food supplies to multiple delivery points on a regular basis," AR 37:1876, they involved "significantly smaller dollar values than required by the Solicitation."  AR 108:6006.

As noted, DLA initially assigned OFI a rating of Neutral on Factor IIB (Past Performance).  It assigned that rating "based on [OFI's] experience with smaller contracts."  AR 37:1887.  DLA, however, subsequently revised OFI's rating on Subfactor B from Neutral to Excellent.  AR 37:1887, 1889.  It explained that, in its view, "the solicitation only required a Neutral rating where a contractor had no relevant experience."  AR 1887.  It concluded that it was appropriate to provide an adjectival rating of Excellent to OFI for Factor II, Subfactor B "based on the references submitted."  AR 37:1887, 1889.  AR 108:6007.  As a result, OFI's overall rating on Factor II was raised to Good—the same rating BMMI received.  AR 108:5986.

In awarding the contract to OFI, DLA acknowledged that "BMMI's technical offer [was] superior to OFI and 7SEAS' strong Good technical offers."  AR 108:6027.  The Source Selection Authority ("SSA") concluded, however, that BMMI's price, which was [. . .]% higher than OFI's) "cannot be supported."  AR 108:6013.  It explained that although the government might

have been willing "to pay smaller premiums, it [was] not willing to pay [. . .]% more to 7SEAS or [. . .]% more to BMMI for the value added benefits." AR 108:6027.[8]

**B.     BMMI's First GAO Protest and DLA's February 15, 2013 Amendment to the Solicitation (Amendment 20)**

On October 5, 2012, BMMI challenged the September 18, 2012 award by filing protest B-407575.1 with the United States Government Accountability Office ("GAO"). AR 100:5714–5782. On November 15, 2012, BMMI filed a supplemental protest with GAO which became protest B-407575.2. AR 100:5783–5806. In its protest, BMMI contended, among other things, that DLA had misapplied the evaluation factors and ignored "the substantial risks associated with allowing a neophyte entity lacking any comparable experience to undertake this very complex and critically important contract." AR 100:5716. In addition to challenging DLA's evaluation of OFI on Factor I, BMMI argued that DLA's evaluation process for Factor IIB (Past Performance) was inconsistent with the Solicitation and improperly gave OFI credit for its performance on smaller, less complex contracts, resulting in an unreasonably high rating of OFI's past performance as Good. AR 100:5715–17, 5728–33.

At DLA's request, GAO provided outcome predictive alternative dispute resolution on December 20, 2012. AR 116:6138. GAO advised DLA that BMMI's Initial Protest would likely be sustained on the grounds that "the Agency's evaluation of Factor II was unreasonable and inconsistent with the solicitation." AR 116:6138. Specifically, "[t]he GAO attorney informed the Agency . . . that she interpreted the solicitation to require the technical panel to consider the size and complexity of an offeror's contracts when evaluating subfactor B (Past Performance) because the solicitation did not clearly indicate that this subfactor would be evaluated differently from subfactor A (Experience), element 1 (Size and Complexity)." AR 116:6138.[9] GAO also

---

[8]  Specifically, the SSA explained that

> OFI offers a good technical proposal and it has the lowest total evaluated price . . . . OFI will provide strong and substantial, documented key personnel and past performance, both in the commercial and government sector. All of OFI's key personnel possess prime vendor specific experience from their tenure with 7SEAS in regards to the geographical areas being supported by this contract, and therefore, is considered with high confidence to the Government for the Bahrain, Qatar, and Saudi Arabia support mission.

AR 108:6026.

[9] The solicitation (prior to Amendments 20-22) did not state whether or not the evaluation of the offeror's past performance under Factor IIB had to be based on contracts of the same size and complexity as the solicitation. See AR 1:185. This was in contrast with the solicitation's treatment of the evaluation of Factor II, Subfactor A1 (Experience/Size and Complexity). For that subfactor, the solicitation clearly required evaluations to be based on contracts of the same size and complexity, defined as 85–100% of estimated dollar value for customers in a prime vendor/regular dealer capacity. AR 1:185.

relied on prior precedent to conclude that DLA was not justified in awarding OFI an Excellent for past performance because of the smaller size of its contracts.  AR 116:6138 (citing Health Net Fed. Servs., B-401652.3, 2009 CPD ¶ 200 (Comp. Gen. Nov. 4, 2009)).

Thereafter, DLA notified GAO that it intended to take corrective action by issuing an amendment to the solicitation clarifying the manner in which the Experience/Past Performance factor would be evaluated, conducting a limited re-evaluation, and reconsidering its Award decision in light of the results of the re-evaluation.  AR 116:6138-6142.  Accordingly, on January 8, 2013, GAO dismissed both protests.  AR 101:5807-5808.  On February 15, 2013, DLA issued Amendment 20 to the Solicitation ("Amendment 20") "to clarify the approach for evaluating experience and past performance under Factor II, Experience/Past Performance."  AR 22:717.  Amendment 20 provided that "[t]he purpose of subfactor A (Experience), element 1 (Size and Complexity) is to compare the size and complexity of an offeror's relevant contracts to the solicited requirement.  The purpose of subfactor B (Past Performance) is to assess an offeror's record of performance under their relevant contracts."  AR 1:186.  AR 22:721.

## C.    BMMI's Second GAO Protest and DLA's March 1, 2013 Amendment to the Solicitation (Amendment 21)

On February 25, 2013, BMMI filed protest B-407575.3 with the GAO challenging the terms of Amendment 20.  AR 102:5809.  Among other things, BMMI argued that "rather than correct the flaw in its earlier evaluation of past performance, DLA has chosen to graft the flawed evaluation scheme into the solicitation," with the result that the evaluation of past performance would continue to be "divorced" from the size and complexity of OFI's reference contracts.  AR 102:5811.

In response to BMMI's protest, DLA issued Amendment 21 on March 1, 2013.  AR 23:725.  Among other things, Amendment 21 changed the language of the solicitation to specify additional criteria that would be taken into account in evaluating offerors' experience and past performance.  AR 23:729.

After the agency filed its report and BMMI filed its comments to the agency's report, GAO again provided outcome predictive alternative dispute resolution on May 21, 2013.  See AR 118:6144.  GAO indicated that it would sustain BMMI's protest on the grounds that DLA's definition of relevancy for purposes of evaluating past performance was overly broad.  AR 118:6144.

Once again, DLA notified GAO that it intended to take corrective action by issuing an amendment to the solicitation clarifying the basis upon which an offeror's past performance history would be evaluated.  AR 117:6143.  DLA then prepared a new corrective action memorandum laying out its intended steps to address the issue.  AR 119:6146–50.  In light of these actions, on May 23, 2013, GAO dismissed protest B-40757.3.  AR 103:5838.

### D.    DLA's July 12, 2013 Amendment to the Solicitation (Amendment 22)

On July 12, 2013, DLA issued Amendment 22 to revise the subfactors Key Personnel, Experience (Size and Complexity), and Past Performance.  AR 24:737.  Key Personnel, formerly an element of Factor IIA (Experience) was designated as subfactor I of Factor I (Distribution System and Quality Assurance).  AR 24:745–46.  To address BMMI's protests regarding the evaluation of OFI under Factor II (Experience/Past Performance), DLA revised the definition of relevant experience by adopting the definition provided by the Department of Defense Source Selection Procedures.  AR 119:6147.  According to the solicitation,

> In establishing what is relevant for Experience [or Past Performance], consideration shall be given to those aspects of an offeror's contract history which provide the most confidence that the offeror will satisfy the current procurement. Those aspects of relevancy include similarity of service/support, dollar value, and complexity (estimated line items/SKUs, estimated average delivery stops per week, estimated average line items ordered per week, and estimated average delivery order dollar value).

AR 24:747–48.  In addition, Amendment 22 added a new adjectival rating of Neutral for "[o]fferors that do not have records of relevant experience, past performance, socioeconomic past performance, and/or Ability One (formerly JWOD) past performance" that "neither rewards nor penalizes offerors without relevant past performance history."  AR 1:187.  DLA explained that it had made the change because  "under the current evaluation scheme, an offeror with little or no experience may receive a Neutral [rating] under the Past Performance subfactors (B-D) and receive a low rating (Fair or Poor) under the subfactor A (Experience), resulting in [a] low rating" for Factor II—a "result . . . inconsistent with FAR 15.305(a)(2)(iv), which provides that an offeror with little or no relevant past performance record 'may not be evaluated favorably or unfavorably on past performance.'"  AR 119:6147.

Under Amendment 22, proposal revisions were due to the Contracting Officer by August 6, 2013.  AR 24:737.  Revisions to an offeror's technical proposal were limited to the three subfactors that were revised by the amendment.  Id.  Revisions to an offeror's price proposal were prohibited unless the offeror could "provide documented evidence showing a direct link between changes in [its] proposal resulting from this amendment and the proposed pricing."  AR 24:737.

OFI and BMMI submitted timely proposal revisions in response to Amendment 22.  AR 74:3392–3447; AR 96:5537-5666.   BMMI's proposal included a downward price adjustment, and included documentation to establish a connection between the price adjustment and the changes made by Amendment 22.  See 96:5644–66.

On September 5, 2013, DLA re-opened negotiations for the sole purpose of discussing proposal changes made in response to Amendment 22.  AR 97:5673.  DLA asked BMMI to address questions regarding its technical proposal and price proposal.  AR 97:5673–5676.  DLA informed BMMI that it would accept BMMI's revised normal distribution pricing but that BMMI's changes to premium distribution pricing and option year pricing were impermissible.

AR 106:5966.  On October 23, 2013, DLA concluded discussions relating to Amendment 22.
AR 99:5711.

### E.      The January 30, 2014 Contract Award to OFI

On January 30, 2014, DLA again awarded the Zone 1 Prime Vendor contract to OFI and
issued an addendum to the first source selection decision.  AR 105:5892-5912.  Employing the
changes in the evaluation system set forth in Amendment 22, OFI received a rating of Neutral on
Factor II (Experience/Past Performance), while BMMI received a rating of Good.  AR 105:5896.
BMMI again received an overall proposal rating of Excellent for its technical proposal.  AR
105:5896.  OFI again received an overall proposal rating of Good.  AR 105:5896.

The technical panel's evaluation ratings for the January 30, 2014 contract award are
summarized in the following chart, which includes the adjectival ratings assigned to each offeror
for each factor and subfactor.  The chart includes ratings of Excellent (E), Good (G), Fair (F),
Poor (P), and Neutral (N).[10]

|  | BMMI | OFI |
|---|---|---|
| **FACTOR/SUB-FACTOR** | | |
| **FACTOR I. Distribution System/Quality Assurance** | **E** | **G** |
| IA.  Location & Capability | G | F |
| IB.  Resource Availability | E | E |
| IC.  Airlift Experience | E | E |
| ID.  Quality Control, Assurance & Warehouse Procedures | E | E |
| IE.  Inspection & Sanitation Procedures | E | G |
| IE1.  Inspection Procedures | E | E |
| IE2.  Sanitation Procedures | E | G |
| IF.  Supplier Selection Procedures | E | E |
| IG.  Food Defense | G | F |
| IH.  Surge and Sustainment Capability | E | E |
| II.  Key Personnel[11] | E | E |
| **FACTOR II.  Experience/Past Performance** | **G** | **N** |
| IIA.  Experience (Size and Complexity) | E | N |
| IIB.  Past Performance | G | N |
| IIC. Socioeconomic Considerations Past | G | N |

---

[10] The Source Selection Plan (Addendum dated August 19, 2013) contains a detailed description
of the rating scheme and the definition of each rating for each factor, subfactor, and element.  AR
30.

[11] This subfactor was originally Factor II, Subfactor A2.  As noted above, pursuant to
Amendment 22, the evaluation of key personnel was moved from an element under Factor IIA to
Factor I, Subfactor I.  AR 24:745–46.

| | | |
|---|---|---|
| Performance | | |
| IIID.  Ability One Support Past Performance | P | N |
| **FACTOR III.  Customer Support/Product Availability** | E | E |
| IIIA.  Customer Service Approach | E | E |
| IIIA1.  Customer Service Approach | E | E |
| IIIA2.  Customer Service Approach | E | E |
| IIIB.  Product Sourcing | E | E |
| IIIC.  Ordering System | E | G |
| IIID.  Pipeline | E | E |
| **FACTOR IV.  Socioeconomic Considerations** | 3 | 2 |
| **FACTOR V.  Ability One Support** | 1 | 1 |
| **FACTOR VI.  DLA Mentoring Business Agreement** | 1 | 3 |
| **FACTOR VII.  CRAF/VISA** | 1 | 2 |
| **OVERALL PROPOSAL RATING** | E | G |

AR 105:5896.

OFI's final Total Evaluated Price of $77,124,222.59 was identified as the low offer.  AR 105:5898.  BMMI's final Total Evaluated Price was $[. . .], which was [. . .]% higher than OFI's final Total Evaluated Price.  AR 105:5898.

The SSDD compared and contrasted the ratings received by BMMI and OFI on each of the technical factors.  It concluded that for "Factor I, one of the most important factors, BMMI and OFI have similar strengths," but that "BMMI's offer contains greater value added benefits in Factor I in three areas."  AR 105:5907.  The "similar strengths" were identified as follows:

> Both firms have (1) substantial equipment and resources to handle the proposed contract; (2) regular successful experience performing airlifts in the past and multiple sources for tri-walls; (3) quality and warehousing procedures which indicate that quality requirements of the solicitation will be exceeded; (4) comprehensive and sophisticated inspection procedures that ensure the receipt, storage, and out bound movement of quality products are delivered to the customer; (5) formal supplier selection programs which promote competition and result in consistent quality with no variation in product at the best available price; (6) the ability to exceed the contractual surge and sustainment requirement of 300% of normal demand levels[;] and (7) key personnel that possess prime vendor specific experience in regard to the geographical areas that will be supported by this contract.

AR 105:5907.  On the other hand, BMMI was found to have greater benefits in the three following respects for Factor I:

> (1) BMMI [. . .]; whereas, OFI will perform all operations from leased facilities; (2) Both of BMMI's facilities are VETCOM approved; whereas, only one of

OFI's two proposed facilities are VETCOM approved; and (3) BMMI is currently operating under a Food Defense Plan; [. . .] whereas, OFI has a Food Defense Plan, but is not currently operating under the plan.

AR 105:5907.

The SSA then turned to Factor II, "the other most important factor." AR 105:5908. With respect to Factor IIA (Experience-Size and Complexity), the SSA found that OFI's Neutral Rating and BMMI's Excellent rating are "considered similar in this comparison because the Neutral rating cannot be viewed favorably or unfavorably." AR 105:5902. The SSA made the same observation with respect to BMMI and OFI's relative ratings on Factor IIB (Past Performance), on which BMMI was rated Good, and OFI was rated Neutral. AR105:5903. And with respect to Factor II overall, the SSA again opined that the ratings (Good for BMMI and Neutral for OFI) were "similar in comparison because the Neutral rating cannot be viewed favorably or unfavorably." AR 105:5908.

The SSA observed that "BMMI has an Excellent overall technical proposal that offers greater value added benefits than OFI's strong Good overall technical proposal." AR 105:5907. It found that "BMMI's proposal has a few benefits that result in a somewhat lower level of risk as compared with OFI's proposal," and that "[t]hese benefits amount to value added benefits for BMMI." AR 105:5909. "More significantly," the SSA reasoned,

> OFI's proposal contains most of the same strengths that are identified in the BMMI proposal; i.e., substantial equipment and resources, regular successful experience performing airlifts, quality and warehousing procedures, comprehensive and sophisticated inspection procedures, formal supplier selection programs, the ability to exceed the contractual surge and sustainment requirements, experienced key personnel, formal customer service programs, automated  systems in place to track deliveries and accuracy of orders, capability of sourcing  all of the items that were identified in the schedule of items or acceptable equivalent items; and proposed pipelines greater than the solicitation's estimated requirement.

AR 105:5909. "[F]or this reason," the SSA observed, "a [. . .]% premium in price to award [the contract] to BMMI is not supportable and OFI offers the best value to the Government." AR 105:5909. See also 105:5911-5912 (outlining strengths of OFI proposal).

In conclusion, the SSA re-emphasized that "[a]lthough BMMI has a higher rating than OFI in Factor I, one of the most important technical factors, its Total Evaluated Price is [. . .]% higher than OFI's Total Evaluated Price." AR 105:5912. The SSA concluded that "[w]hile the Government may have been willing to pay smaller premiums, it is not willing to pay [. . .]% ($[. . .]) more to BMMI for the value added benefits identified above." AR 105:5912. "Therefore," the SSA concluded, "I have determined that OFI's proposal represents the best value to the government." AR 105:5912.

13

**F.      BMMI's Third GAO Protest and DLA's Re-evaluation of the Best-Value Tradeoff Analysis**

On February 10, 2014, BMMI filed a third protest (B-407575.5) with GAO challenging the January 30, 2014 award to OFI.  AR 106:5913.  BMMI argued, in part, that DLA's award was invalid because it erroneously evaluated OFI's Neutral rating on Factor II (Experience/Past Performance) as equal to BMMI's Good rating, with the effect of eliminating BMMI's advantage on that factor in violation of FAR 15.305(a)(2)(iv).  AR 106:5927.

On February 24, 2014, the agency notified GAO and BMMI of its intent to take corrective action by canceling the award to OFI, conducting a re-evaluation of the best-value tradeoff analysis, and issuing a new source selection decision.  AR 107:5979.  In response, GAO dismissed the protest on February 26, 2014.  AR 107:5959.

On April 23, 2014, DLA issued a new SSDD which again awarded the contract to OFI. AR 46:2395–2417.  See AR 50:2464 (awarding the contract No. SPE300-14-D-4004 to OFI on April 28, 2014).  The technical panel's final evaluation ratings for BMMI and OFI were the same as those contained in the January 30, 2014 award decision.  Compare AR 105:5896 with AR 46:2399.  The April 23rd SSDD, however, explicitly acknowledged for the first time that— because of its experience and past performance—BMMI had an advantage over OFI with respect to Factor II.  The comparison of OFI and BMMI's Experience and Past Performance no longer characterized their ratings as "similar in comparison because the Neutral rating cannot be viewed favorably or unfavorably."  Instead, the SSDD acknowledged BMMI's relative "advantage" over OFI with respect to Factor II and its subparts, specifically noting the fact that BMMI's past experience and performance provided affirmative indication that it would be likely to successfully perform the requirements of the solicitation.  46:2405–06.

According to the SSDD, "BMMI has an Excellent overall technical proposal that offers greater value added benefits than OFI's strong Good overall technical proposal."  AR 46:2410– 13.  Thus, the SSDD explained that with respect to Factor I,

> BMMI [. . .].  OFI will lease its Bahrain and Qatar facilities.  So, BMMI has lower performance risk in Bahrain, but the performance risk related to [. . .].  BMMI has VETCOM approved facilities and this saves the Government the time and expense of scheduling and conducting audits and confirms the highest level of sanitation required.  OFI has a leased VETCOM approved facility in Qatar, but not Bahrain.  As such, the time, cost, and risk are more favorable for BMMI in Bahrain, but equal for both companies in Qatar.  In regard to a Food Defense Plan, BMMI is operating under a Food Defense Plan [. . .]; versus OFI, which has a plan in place but is not operating under it.  This is considered a value added benefit because lower performance risk is associated with food defense plans that are already operationally proven.

AR 46:2412. With respect to Factor II,

14

BMMI demonstrated relevant experience/past performance with contracts exceeding the size and complexity of the estimated requirements of the solicitation, wherein, most references rated them Good, and most socioeconomic goals were met.  OFI has no relevant experience, which cannot be viewed favorably or unfavorably.  This is considered a value added benefit because lower performance risk is associated with BMMI's experience/past performance.  BMMI's experience/past performance indicates that it is likely to successfully perform the solicitation's requirement, while OFI's Neutral rating does not provide any indication whether it is or is not more likely to successfully perform the solicitation's requirement.

AR 46:2412–13.  "More significantly, OFI's proposal contains most of the same strengths that are identified in the BMMI proposal."  AR 46:2413.  Specifically, the SSA observed that "[i]n Factor I, one of the most important factors, both firms have substantial equipment and resources, regular successful experience performing airlifts, quality and warehousing procedures, comprehensive and sophisticated inspection procedures, formal supplier selection programs, the ability to exceed the contractual surge and sustainment requirements, and experienced key personnel."  AR 46:2413.  Further, the SSA explained that "[i]n Factor III, both firms have formal customer service programs, automated systems in place to track deliveries and accuracy of orders, capability of sourcing all of the items that were identified in the schedule of items or acceptable equivalent items; and proposed pipelines greater than the solicitation's estimated requirement."  AR 46:2413.

In addition, the April 23rd decision also acknowledged for the first time that BMMI's Poor rating on Factor IID (AbilityOne Support Past Performance) indicated that it might not perform at a satisfactory level on this requirement of the solicitation, while OFI's Neutral rating did not provide any indication one way or the other regarding whether it would meet AbilityOne goals.  AR 46:2407.  Previously, DLA had concluded that BMMI and OFI were considered "equal" with respect to this factor.  AR 105:5904.

The acknowledgement of BMMI's overall advantage on Factor II did not, however, change the ultimate decision.  In language essentially identical to that contained in the January award decision, DLA again concluded that the relative benefits of BMMI's superior technical ratings, "in light of the strengths contained in the OFI proposal," did not "justify paying a [. . .]% premium."  AR 46:2413.

### G.    BMMI's Fourth Protest and GAO's Dismissal of the Protest

On May 6, 2014, BMMI filed its fourth protest before the GAO challenging the DLA's decision on essentially the same grounds as its prior protests.  AR 54:2627–50.  It argued that—despite the revised language in the April award decision—DLA had persisted in improperly treating OFI's Neutral Rating on Factor II as essentially equal to BMMI's Good rating, and had also continued to elevate price considerations over experience and performance, contrary to the solicitation's best-value approach.  AR 54:2630.

On July 29, 2014, GAO issued a decision denying BMMI's protest.  AR 124:6210.  GAO determined that BMMI's protest amounted to a disagreement with the SSA's judgment as to which proposal offered the best value to DLA.  AR 124:6216-18.  According to GAO, in the April source selection decision, the SSA acknowledged BMMI's comparative advantages and OFI's lack of past performance record and adequately detailed the basis for its decision that the price premium associated with an award to BMMI was not justified in light of the strengths of OFI's proposal.  AR 128:6210.  Accordingly, GAO denied BMMI's protest.

### H.      BMMI's Protest Before This Court

Following the GAO's decision, BMMI filed its bid protest in this Court on August 8, 2014.  On August 15, 2014, BMMI moved for a Temporary Restraining Order to enjoin DLA from proceeding with the performance of the contract by OFI and from requiring BMMI to commence a "ramp down" of its performance under BMMI's current contract or any bridge contract that might subsequently be executed by the parties.  Appl. for TRO 1, ECF No. 17.  Prior to oral argument on the Application for a TRO, the parties filed a joint motion advising the Court that they had reached an agreement to maintain the status quo until September 30, 2014 (the date by which the Court had indicated that it intended to rule on the parties' cross motions for judgment on the administrative record).  ECF No. 24.  At the parties' request, the Court entered an order consistent with that agreement, deeming BMMI's motion for a TRO withdrawn without prejudice.  ECF No. 24.

Oral argument on the parties' cross motions for judgment on the administrative record was held on September 15, 2014.  Accordingly, the case is now ripe for a final decision on the merits.

### DISCUSSION

### I.      Jurisdiction

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012).  A party is an "interested party" with standing to bring suit under 28 U.S.C. § 1491(b)(1) if the party "is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013).  A bidder has a direct economic interest if it suffered a competitive injury or prejudice.  Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing").

In a post award bid protest, the bidder has suffered prejudice if it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  See also Weeks Marine Inc., v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009); Rex Serv. Corp.

v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006).  "In other words, the protestor's chance of securing the award must not have been insubstantial."  Info. Tech., 316 F.3d at 1319.

It is undisputed that BMMI is an "interested party" within the meaning of the statute.  It was an actual offeror for the contract in question.  Further, BMMI is the incumbent contractor, was the second lowest price bidder, and received higher technical ratings than the awardee.  Because BMMI's chance of securing the award upon a new evaluation of the bidders' proposals would not be "insubstantial" (Info Tech., 316 F.3d at 1319), the jurisdictional requirement that BMMI establish its standing has been met.

## II.      Standard for Judgment Upon the Administrative Record

Pursuant to RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record.  Bannum, Inc., 404 F.3d at 1356.  The Court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record."  Id. at 1357.[12]  Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary."  Baird v. United States, 77 Fed. Cl. 114, 116 (2007).  The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006).  Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record.  Bannum, Inc., 404 F.3d at 1356.

## III.     Standard of Review of Procurement Decisions

The Court reviews challenges to a contract award under the same standards used to evaluate agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2012).  See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5").  To successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); Bannum, Inc., 404 F.3d at 1351.  "The arbitrary and capricious standard applicable here is highly deferential.  This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

In a bid protest, the disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis.  Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1338 (Fed. Cir. 2001).  Indeed, such a challenge can succeed only where the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or

---

[12] RCFC 52.1 abrogated and replaced RCFC 56.1.  RCFC 52.1 incorporates the reasoning of Bannum, Inc.  RCFC 52.1, Rules Committee Note (June 20, 2006).

the product of agency expertise." <u>Ala. Aircraft Indus., Inc.–Birmingham v. United States</u>, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (citing <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co. ("State Farm")</u>, 463 U.S. 29, 43 (1983)).

"The protestor's burden is greater in [a] negotiated procurement, as here, than in other types of bid protests because 'the contracting officer is entrusted with a relatively high degree of discretion.'" <u>Glenn Defense Marine (ASIA), PTE Ltd. v. United States</u>, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1330 (Fed. Cir. 2004)). "Moreover, th[e] court accords contracting officers an even greater degree of discretion when the award is determined based on the best value to the agency." <u>Glenn Defense</u>, 720 F.3d at 908 (internal citations omitted); <u>see also</u> <u>Croman Corp. v. United States</u>, 724 F.3d 1357, 1363 (Fed. Cir. 2013); <u>Galen Med. Assocs.</u>, 369 F.3d at 1330; <u>Advanced Data Concepts, Inc.</u>, 216 F.3d at 1058; <u>Banknote Corp. of Am. Inc.</u>, 365 F.3d 1345, 1355 (Fed. Cir. 2004); <u>E.W. Bliss Co.</u>, 77 F.3d 445, 449 (Fed. Cir. 1996); <u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d 955, 958–59 (Fed. Cir. 1993); <u>Am. Tel. & Tel. Co. v. United States</u>, 307 F.3d 1374, 1379 (Fed. Cir. 2002). In short, an agency's contract award is "least vulnerable to challenge" when based on a best-value determination. <u>PlanetSpace Inc. v. United States</u>, 96 Fed. Cl. 119, 125 (2010) (citing <u>Galen Med. Assocs.</u>, 369 F.3d at 1330).

Given this highly deferential standard of review, the court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" <u>Impresa</u>, 238 F.3d at 1332-33 (quoting <u>Saratoga Dev. Corp. v. United States</u>, 21 F.3d 445, 456 (D.C. Cir. 1994)). The agency need only articulate a "rational connection between the facts found and the choice made," and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." <u>State Farm</u>, 463 U.S. at 43.

## IV.   Merits

The gravamen of BMMI's attack on DLA's award decision is its contention that—in conducting its best-value tradeoff analysis—DLA failed to give sufficient weight to BMMI's superior technical rating (particularly its advantage over OFI with respect to Technical Factor II, Experience/Past Performance). Pl.'s Mot. 20, 23-28, ECF No. 29. BMMI further argues that the award decision does not contain an adequate explanation for DLA's unwillingness to pay a [. . .]% price premium to BMMI, given BMMI's technical superiority over OFI. Pl.'s Mot. 33-34. It contends that in finding that BMMI's price premium was excessive, DLA failed to give adequate consideration to: (1) the complexity and importance of the services to be provided under the contract; (2) BMMI's relevant experience and past performance record; (3) OFI's lack of experience on contracts of similar size and complexity; and (4) BMMI's higher rating on technical Factor I. BMMI argues that DLA's final award decision merely paid "lip service" to BMMI's technical advantages and that "[t]hroughout [the procurement process] DLA has treated Experience/Past Performance, and OFI's lack thereof, as an inconvenient obstacle to be overcome rather than one of the two most important factors to be considered in making the award decision." <u>Id.</u> at 22, 24.

For the reasons set forth below, the Court finds DLA's arguments unpersuasive and insufficient to justify interference with DLA's determination that OFI's proposal, and not BMMI's, would provide the best value to the government. Accordingly, the government's motion for judgment on the administrative record is **GRANTED**.

### A.   DLA's Tradeoff Decision Was Rational, Consistent With the Solicitation, and Adequately Documented.

Federal law requires the DLA to include in a solicitation a statement of "all significant factors and significant subfactors which the head of the agency reasonably expects to consider in evaluating . . . competitive proposals (including cost or price, cost-related or price-related factors and subfactors, and noncost-related or nonprice-related factors and subfactors)." 10 U.S.C. § 2305(a)(2)(A). In addition, the solicitation must specify whether the nonprice factors, when combined, are significantly more important than, approximately equal to, or significantly less important than price. 10 U.S.C. § 2305(a)(3)(A)(iii); FAR 15.304(e). There is no dispute that DLA complied with these requirements.

In reviewing proposals submitted in response to a solicitation, applicable law requires the agency must conduct an evaluation and make an award "based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1); 41 U.S.C. § 3701(a); see also FAR 15.305(a). Its source selection decision must "be based on a comparative assessment of proposals against all source selection criteria in the solicitation." FAR 15.308; Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 757-58 (2008); Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 386 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."). Finally, the agency "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." Id. at 383.

BMMI contends that DLA's decision to award the contract to OFI departed from the evaluation scheme outlined in the solicitation in violation of these requirements. Pl.'s Mot. 19. It argues that the solicitation provided that the technical factors (particularly Factors I and II) were more important than price, and that DLA violated this provision by "fail[ing] to give sufficient weight to BMMI's huge advantage over OFI on the crucial Experience/Past Performance factor." Pl.'s Mot. 22. It contends that DLA's decision, contrary to the solicitation, "neglects to consider properly the significance of Factor II and contend with the risks associated with awarding the contract to an offeror with no relevant experience on such a complex undertaking." Id. at 23-24. BMMI's contentions are unpersuasive.

### 1.   DLA Acknowledged BMMI's Technical Superiority over OFI Under the Evaluation Criteria Set Forth in the Solicitation.

First, contrary to BMMI's arguments, the administrative record reflects that DLA identified and took into consideration the value added benefits that were present in BMMI's proposal both with respect to Technical Factor I (Distribution Capability/Quality Assurance) and Technical Factor II (Experience/Past Performance). See AR 46:2410–13. It also reveals that DLA appreciated that the value added benefits and advantages of BMMI's proposal (particularly

with respect to its experience and past performance on contracts of similar size and complexity), established that there would be a reduced risk of nonperformance of the solicitation's requirements if BMMI, rather than OFI, were awarded the contract. AR 46:2411.

Thus, the SSDD acknowledged that "BMMI has an Excellent overall technical proposal that offers greater value added benefits than OFI's strong Good overall technical proposal," and it accurately identified the differences between BMMI's proposal and OFI's proposal under all technical factors. AR 46:2410–13. The SSDD explicitly assigned the most weight to Factors I and II and then detailed the ways in which the value added benefits BMMI could provide might reduce costs and performance risks. Thus, the SSDD explains that with respect to Factor I, "one of the most important factors,"

> BMMI [. . .]. OFI will lease its Bahrain and Qatar facilities. So, BMMI has lower performance risk in Bahrain, but the performance risk related to [. . .]. BMMI has VETCOM approved facilities and this saves the Government the time and expense of scheduling and conducting audits and confirms the highest level of sanitation required. OFI has a leased VETCOM approved facility in Qatar, but not Bahrain. As such, the time, cost, and risk are more favorable for BMMI in Bahrain, but equal for both companies in Qatar. In regard to a Food Defense Plan, BMMI is operating under a Food Defense Plan[,] [. . .]; versus OFI, which has a plan in place but is not operating under it. This is considered a value added benefit because lower performance risk is associated with food defense plans that are already operationally proven.

AR 46:2412. The SSDD conducted a similar analysis with respect to "Factor II, the other most important factor," observing that

> BMMI demonstrated relevant experience/past performance with contracts exceeding the size and complexity of the estimated requirements of the solicitation, wherein, most references rated them Good, and most socioeconomic goals were met. OFI has no relevant experience, which cannot be viewed favorably or unfavorably. This is considered a value added benefit because lower performance risk is associated with BMMI's experience/past performance. BMMI's experience/past performance indicates that it is likely to successfully perform the solicitation's requirement, while OFI's Neutral rating does not provide any indication whether it is or is not more likely to successfully perform the solicitation's requirement.

AR 46:2412–13.[13]

---

[13] With respect to Factor II, DLA's recognition that BMMI's Good past performance rating provided it with an advantage over OFI was, of course, consistent with law. While an agency may not assign an unfavorable rating to an offeror based on its lack of a past performance history, it is entitled to treat a high past performance rating (like BMMI's) as worth more than a Neutral past performance rating (like OFI's). See O'Gara Training and Servs., LLC, B-404901.2, 2011 CPD ¶ 171, at 7 (Comp. Gen. July 28, 2011); Am. Floor Consultants, Inc., B-

Finally, DLA also carefully evaluated and compared OFI and BMMI on the seven other technical factors.  For all of these, including Factor III (the second most important factor after Factors I and II), DLA found OFI and BMMI's relative strengths essentially equal, and BMMI does not challenge this assessment.  See Oral Arg. Tr. 14 (Counsel for BMMI observing that other factors "basically wash out").[14]

### 2. DLA Acted Within Its Discretion in Awarding the Contract to OFI Based on Its Conclusion That BMMI's Price Premium Was Unwarranted.

There is no merit to BMMI's argument that given its advantages as to Factors I and II, DLA's award of the contract to OFI effectively and unlawfully converted a best-value procurement into a lowest-price, technically-acceptable procurement.  Pl.'s Mot. 27–28.  As noted above, it is well established that the scope of agency discretion to choose among qualified offerors is particularly broad when a contract award decision is based on a best-value determination.  Source selection officials therefore have broad discretion in making a price/technical tradeoff, "and the extent to which one may be sacrificed for the other is governed only by the test of rationality and consistency with the established evaluation factors."  Truetech, Inc., B-402536.2, 2010 CPD ¶ 129, at 4 (Comp. Gen. June 2, 2010).  In particular, an agency may select a lower -priced, technically-lower-rated proposal in a best-value procurement even when technical factors have been identified as being of greater importance than price, where it reasonably concludes that the technically superior proposal does not warrant a price premium.  See Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 553 (2013) ("Even where a solicitation provides that technical criteria are more important than price, an agency must select a lower-priced, lower technically scored proposal if it reasonably decides that the premium associated with selecting the higher-rated proposal is unwarranted." (citing Serco Inc. v. United States, 81 Fed. Cl. 463, 497 (2008))); Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. 16, 49 (2010) ("Even when a solicitation emphasizes technical merit, an agency 'may properly select a lower-priced, lower-technically-rated proposal if it decides that the cost premium involved in selecting a higher-rated, higher-priced proposal is not justified, given the acceptable level of

---

294530.7, 2006 CPD ¶ 97, at 5 (Comp. Gen. June 15, 2006); see also W. Coast Unlimited, B-281070.2, 99-2 CPD ¶ 40, at 6–7 (Comp. Gen. Aug. 18, 1999) (rejecting an interpretation that FAR 15.305(a)(2)(iv) "required the agency to consider [an offeror's] lack of relevant past performance to be the same as an offeror's relevant, good past performance' as contrary to the regulation's requirement not to treat lack of relevant past performance favorably).  Here, the solicitation acknowledges as much, observing that "[w]hile a neutral evaluation will not affect an offeror's rating, it may affect the offeror's ranking if a significant number of the other offerors participating in the acquisition have past performance rating either above or below satisfactory." AR 1:187.

[14] Both OFI and BMMI were rated Excellent on Factor III (Customer Service/Product Availability).  AR 46:2399.  The only difference in rating between BMMI and OFI was with respect to Subfactor IIIC (Ordering System) based upon the fact that—as the SSA noted— BMMI is currently using all EDI transaction sets for ordering while OFI is only using some of the required transaction sets.  AR 46:2408.

technical competence available at the lower price.'" (quoting <u>Banknote Corp.</u>, 56 Fed. Cl. at 390)); <u>Afghan Am. Army Servs. Corp. v. United States</u>, 90 Fed. Cl. 341, 360 (2009) ("[I]n a best-value procurement, the agency may decide to select a lower-technically-rated proposal—even if the solicitation emphasizes the importance of technical merit—if it decides that the 'higher price of a higher-technically-rated proposal is not justified'" (quoting <u>Blackwater Lodge & Training Center., Inc. v. United States</u>, 86 Fed. Cl. 488, 514 (2009))).

To be sure, an agency must include in its final award decision "the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs." FAR 15.308. In that regard, "[c]onclusory statements, devoid of any substantive content, . . . fall short of" this documentation requirement. <u>Serco Inc.</u>, 81 Fed. Cl. at 497. Therefore, it is not sufficient for the government to simply assert that a proposal's technical superiority is not worth the payment of a price premium; it must explain the reasons for that conclusion. <u>FirstLine Transp. Sec., Inc. v. United States</u>, 100 Fed. Cl. 359, 381 (2011) (observing that "bare statement that the benefits of the [plaintiff's] proposal do not justify the higher price of the proposal does not adequately address the issue"); <u>Femme Comp Inc.</u>, 83 Fed. Cl. at 767–68 (holding that FAR 15.308 requires more than conclusory assertions to support the selection of a lower-priced, technically inferior offer).[15] The documentation, however, "need not quantify the tradeoffs that led to the decision." FAR 15.308. And "[i]n performing the tradeoff analysis, the agency need neither assign an exact dollar value to the worth associated with the technical benefits of a contract nor otherwise quantify the non-cost factors." <u>Serco Inc.</u>, 81 Fed. Cl. at 497 (citing FAR 15.308).

Here, contrary to BMMI's contentions, DLA did not rest on generalized statements comparing the strengths and weaknesses of the two proposals or merely assert a conclusion that BMMI's value added benefits were not worth the price premium. To the contrary, as described above, the SSA compared the two proposals and their relative risks in detail. AR 46:2410–13. Further, DLA also catalogued the strengths of OFI's proposal (<u>id.</u>; <u>see also</u> OFI's Final Technical Evaluation at AR 37:1825-1937), which were the ultimate basis for its conclusion that paying BMMI the [. . .]% price premium that it sought for its technically superior proposal did not represent the best value to the government.

Thus, as described above, the SSA acknowledged that BMMI's proposal contained value added benefits "that result in a somewhat lower level of risk as compared with OFI's proposal." AR 46:2413. Nonetheless, the SSA stated, and "[m]ore significantly, OFI's proposal contains most of the same strengths that are identified in the BMMI proposal." AR 46:2413.

---

[15] <u>See also</u> <u>Preferred Sys. Solutions</u>, B-292322 <u>et al.</u>, 2003 CPD ¶ 166, at 7 (Comp. Gen. Aug. 25, 2003) (sustaining a protest because, inter alia, "there was no analysis as to why the well-documented technical superiority of [plaintiff's] proposal with its attendant advantages was not worth the associated cost/price premium"); <u>Johnson Controls World Servs.</u>, B-289942 <u>et al.</u>, 2002 CPD ¶ 88, at 7 (Comp. Gen. May 24, 2002) ("While the SSA states that he compared the various mission suitability strengths of each offeror and found 'no discernable benefits' in the other proposals that offset the 'significant advantage' of the lowest cost/price offered by the DynCorp proposal, such general statements fall far short of the requirement to justify cost/technical tradeoff decisions.") (internal citations omitted).

Specifically, the SSA observed that "[i]n Factor I, one of the most important factors, both firms have substantial equipment and resources, regular successful experience performing airlifts, quality and warehousing procedures, comprehensive and sophisticated inspection procedures, formal supplier selection programs, the ability to exceed the contractual surge and sustainment requirements, and experienced key personnel." AR 46:2413. Further, the SSA explained, "[i]n Factor III, both firms have formal customer service programs, automated systems in place to track deliveries and accuracy of orders, capability of sourcing all of the items that were identified in the schedule of items or acceptable equivalent items; and proposed pipelines greater than the solicitation's estimated requirement." AR 46:2413. "It is for this reason," the SSA concluded, that the [. . .]% premium in price to award to BMMI "is not supportable" and that "OFI offers the best value to the Government." AR 46:2413; see also AR 46:2416 (describing in detail OFI's capabilities and basis for concluding that it will successfully perform the contract requirements).

In short, the bottom line for the SSA was that—notwithstanding BMMI's technical superiority—OFI's strengths were such that, on balance, it would not be in the government's best interest to pay a [. . .]% premium for the reduction of performance risk that BMMI's proposal offered. This rationale, documented in the SSDD, appears to the Court to be a reasonable one. See Mil-Mar Century Corp., 111 Fed. Cl. at 560 (award to technically-inferior, less experienced, lower-priced offeror in best-value tradeoff was sufficiently documented and rational where agency acknowledged technical advantages and lower risk associated with plaintiff's proposal but selected lower-priced offeror based on agency's confidence in awardee's own strengths, which agency documented and discussed).

Nor is the rationale used to award the Zone 1 contract to OFI inconsistent with DLA's treatment of the contract award for Zone 2, as BMMI argues. Thus, BMMI observes that DLA was willing to pay a third offeror (Seven Seas) a [. . .]% price premium based on technical superiority in connection with the Zone 2 contract. Pl.'s Mot. 33-34. It claims that "[t]his unequal treatment reveals both the arbitrariness of the Zone 1 award decision and the lack of adequate explanation for the best value tradeoff." Pl.'s Reply 16. But contrary to BMMI's arguments, DLA's discussion of the differences between Zones 1 and 2 in its original contract award actually provide further support for the rationality of its decision not to pay BMMI a higher [. . .]% price premium based largely on its experience and OFI's lack thereof.

Thus, DLA's first SSDD, which awarded contracts for both Zone 1 and Zone 2, observed that the "Zone 1 region is not as intricate as Zone 2 due to the lack of large Navy ship support demands." AR 108:6027.[16] Further, it explained that "[t]he customers supported in [Zone 1] are mainly Air Force, Army and Navy Land customers," so that there would be "no erratic demand fluctuations created by the sudden appearance of Navy Ships, which does routinely occur in Zone 2." AR 108:6027. For these reasons, "[u]nlike Zone 2, past experience supporting Navy Ships is not a benefit in support of this contract for this zone [Zone 1]." AR 108:6027. In addition, it noted, "regional instability and surges to a second battle group create additional support difficulties that are unique to Zone 2." AR 108:6026. These characteristics of Zone 2

---

[16] The Zone 2 region contains approximately 80% of the Navy ships requirements. AR 108:6001. In addition, Zone 2 is the only region in the world where both Atlantic Fleet and Pacific Fleet transit together. Id.

(which are not present for Zone 1) made Seven Seas' experience with contracts of similar size and complexity "particularly valuable" to the government. AR 108:6001. Consequently, the SSA concluded that Seven Seas' past experience was "well worth the [. . .]% price difference between it and OFI" for purposes of Zone 2. Id.

BMMI's attempt to draw a contrast between DLA's willingness to pay a [. . .]%  price premium to Seven Seas in Zone 2, and DLA's unwillingness to pay a [. . .]% price premium to BMMI for Zone 1, is unhelpful to its position.  As the administrative record reveals, the rationale for paying Seven Seas a price premium for its technical superiority and experience for the Zone 2 contract was based on the unique characteristics of that zone.  If anything then, the discussion of the differences between Zones 1 and 2 contained in the original SSDD provides additional support for DLA's decision not to pay what would have been an even higher premium to BMMI for the Zone 1 contract.

### 3.    The DLA Did Not Downplay BMMI's Technical Advantages.

Finally, the Court finds inadequate support in the record for BMMI's contention that, in discussing their relative strengths and weaknesses, DLA artificially inflated OFI's capabilities while downplaying BMMI's technical advantages.  Pl.'s Mot. 24.   For example, BMMI argues that the SSDD's reference to OFI having "similar strengths" to BMMI is meant to suggest that OFI's proposal is essentially technically equal to BMMI's proposal.  Pl.'s Mot. at 26.  See AR 46:2410 ("[i]n Factor I, one of the most important factors, BMMI and OFI have similar strengths"); AR 46:2411 (observing that OFI and BMMI have "similar strengths" with respect to Factor III); AR 46:2413 ("OFI'S proposal contains most of the same strengths that are identified in the BMMI proposal.").  But contrary to BMMI's contention and as described above, the SSA also makes a point to distinguish BMMI's unique strengths relative to OFI where applicable.  In short, notwithstanding the SSA's comment regarding some of the strengths common to both OFI and BMMI (the substance of which BMMI does not challenge), the SSDD confirms that the SSA also understood and considered BMMI's distinct value-added benefits, including the value of its proven track record as the incumbent contractor.  See AR 46:2410–13.

The other identified example of downplaying BMMI's relative strengths is even less compelling.  BMMI complains that the first award decision issued in September 2013 characterized BMMI's Food Defense Plan (Factor IG) as exhibiting a "clear advantage" over OFI's, while the two more recent SSDDs eliminated the "clear advantage" language.  Pl.'s Mot. at 26.   But the record reveals a non-invidious explanation for this change in language, which belies BMMI's theory that DLA was deliberately downplaying its advantages.  Specifically, the second and third award decisions (but not the first) noted that although BMMI was already operating under a Food Defense Plan, [. . .].  AR 105:5908; 46:2412.  Thus, while the second and third award decisions continued to find (as had the first) that BMMI had a value-added benefit "because lower performance risk is associated with food defense plans that are already operationally proven," AR 46:2412, the advantage to BMMI was perhaps no longer as "clear" given the apparently new appreciation for the fact that a [. . .] to implement the plan under the contract.

The cases that BMMI cites in support of its contention that DLA artificially inflated OFI's capabilities while downplaying BMMI's technical advantages are inapposite.  In Femme Comp Inc., the court found a pattern of unequal treatment where numerous examples showed, among other disparities, that the SSA had emphasized the nature, quality, and extent of a proposal's strength when it benefitted a lower-priced proposal but ignored the nature, quality, and extent of a proposal's strengths and relied instead on the adjectival/color ratings when a higher-priced proposal was found to be superior.  83 Fed Cl. at 769.  The Court discerns no similar pattern here of "boost[ing] the technical merits of the low-priced proposal[]" while "denigrat[ing] the technical superiority of the higher-priced proposal[]."  Id.  Similarly, in FirstLine Transp. Sec., Inc., the SSDD was deficient because the evaluation board had failed to consider the comparative strengths, weaknesses, benefits, and disadvantages of each of the proposals.  100 Fed. Cl. at 378.  The FirstLine court found, in fact, that the agency "not only ignored the dramatic difference in the number of strengths assigned to the proposals; it also took affirmative steps to minimize or neutralize those differences in the [evaluation board's] report."  Id.  Again, that is not the case here.

In short, DLA properly evaluated both proposals against the evaluation criteria set forth in the solicitation, discussed their comparative advantages and disadvantages in an objective fashion, and documented a reasonable rationale for its best-value tradeoff decision.  In deciding to award the contract to OFI rather than to BMMI, DLA acted within the scope of its discretion and on the basis of its expertise concerning the logistics of providing food distribution services to members of the United States military stationed abroad.  Given the narrow scope of judicial review of award decisions in this context, BMMI has not provided the Court with an adequate basis to upset DLA's contract award decision.

**B.      There Is No Merit to BMMI's Arguments That DLA "Papered the Record" to Create the Impression That It Conducted a Proper Evaluation When It Had Not Done So.**

As described above, the administrative record reveals that DLA found BMMI's price premium excessive and unwarranted because it had sufficient confidence in OFI's ability to perform the Zone 1 contract, based on the many strengths that OFI's proposal shared with BMMI's, which the SSDD discussed in detail.  See, e.g., AR 46:2413.  As discussed above, that justification is legally sufficient to meet DLA's burden of explaining with specificity its rationale for selecting the lower-priced but technically inferior proposal.

BMMI argues, nonetheless, that the Court should view the authenticity of DLA's tradeoff discussion with skepticism.  While stopping short of accusing DLA of bad faith, BMMI insinuates that DLA's discussion of BMMI's technical advantages was not genuine.  According to BMMI, "[i]nstead of actually conducting a new analysis" or "actually consider[ing] OFI's 'Neutral' experience in its analysis," after BMMI filed its third protest, DLA merely "paper[ed] the record" to "make it appear that the ultimate decision was proper."  Pl.'s Mot. at 24.

The Court finds nothing in the record to support BMMI's contentions that DLA's decision-making process was inauthentic and that DLA "merely gave lip service to BMMI's superior past performance" in its most recent decision and "simply reached the same result as if

nothing had changed." Pl.'s Mot. at 22.  In fact, the narrative in DLA's most recent April award, which is currently before the Court, reflects its re-evaluation of the proposals to address the concerns BMMI raised in its third protest, as evidenced by the substantive changes the SSA made to its decision.  See generally AR 46:2395–2417.

Thus, the revised SSDD notes in its Evaluation Findings for Factor IIA, Experience (Size and Complexity), that BMMI had an advantage over OFI because of its experience with contracts of similar size and complexity.  AR 46:2405.  This was a substantive departure from the prior SSDD which stated that OFI's Neutral rating and BMMI's Excellent rating were considered "similar" "because the Neutral rating cannot be viewed favorably or unfavorably." AR 105:5902.  Similarly, the revised SSDD notes in its Evaluation Findings for Factor IIB, Past Performance, that "7SEAS and BMMI's past performance indicates that they are likely to successfully perform the solicitation's requirement, while OFI's Neutral rating does not provide any indication whether it is or is not likely to successfully perform the solicitation's requirement. Therefore, 7SEAS and BMMI have the advantage over OFI."  AR 46:2406.  The prior SSDD, by contrast, had found that—as with Subfactor A—OFI's Neutral rating on Subfactor B and BMMI's Good rating "are considered similar in this comparison." AR 105:5903.

The revised SSDD notes in its Evaluation Findings for Factor IIC, Socioeconomic Considerations Past Performance, that BMMI had the advantage over both OFI and 7SEAS.  AR 46:2406.  This was again a substantive departure from the SSA's findings for Subfactor C in the prior SSDD.  The prior SSDD concluded that BMMI had an advantage over 7SEAS, which received a rating of Poor, but did not compare BMMI to OFI because BMMI's rating was Neutral.  AR 105:5903.

Finally, the revised SSDD notes in its Evaluation Findings for Factor IID, AbilityOne Support Past Performance, that "BMMI's past record with meeting AbilityOne goals indicates that it may not perform at a satisfactory level on these goals to meet the solicitation's requirements."  AR 46:2407.  The other two offerors, OFI and 7SEAS, received Neutral ratings and, as such, were not rated favorably or unfavorably.  Id.  This, again, was a substantive departure from the SSA's findings for Subfactor D in the prior SSDD.  The prior SSDD had not assigned any risk factors based on this subfactor and had concluded that all three offers were equal because BMMI had a rating of Poor and the other offerors' Neutral ratings did not indicate an advantage.  AR 105:5903–04.

BMMI contends that despite these changes (which it characterizes as designed to merely "create the impression that [DLA] conducted a proper comparison"), "nothing in the decision document suggests that the SSA gave BMMI's superiority on Factor II any meaningful weight in making the award decision."  Pl.'s Mot. 25; see also Pl.'s Reply 3 ("[I]nstead of actually conducting a new analysis that properly grappled with the fact that BMMI's strong experience and past performance history is superior to OFI's non-existent one, DLA merely edited the SSDD in [an] attempt to get around BMMI's protest grounds.").  It emphasizes that the language in the final section of the SSDD, captioned "Award Decision," is "virtually identical" to the language contained in the prior SSDD and "fails to make any mention of BMMI's superiority on Factor II."  Pl.'s Mot. 25 (emphasis in original).

The Court, of course, cannot conclude that BMMI's superiority as to Factor II was "essentially inconsequential in the award decision" as BMMI would have it do, Pl.'s Mot. 25, simply because the final section of the SSDD does not restate BMMI's advantages on Factor II where these advantages had already been acknowledged and discussed in earlier sections of the SSDD. The Court reads the award decision as a whole to determine whether it exhibits a "rational connection between the facts found and the choice made," and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." State Farm, 463 U.S. at 43. As discussed in greater detail above, the final award decision references BMMI's advantages both with respect to Factor I and Factor II. See AR 46:2412-13. It also does more than just note BMMI's advantage with respect to Factor II—it acknowledges that this advantage reduced the risk of non-performance of the solicitation's requirements. Id. Most importantly, it explains why, despite these considerations, the SSA chose to select OFI's lower-priced proposal. AR 46:2413.

Of course, the fact that DLA's corrections and re-evaluations did not change the ultimate result—an award of the contract to OFI—does not provide a sufficient basis for the Court to infer that DLA's evaluation process was "results-oriented" and manipulated to ultimately justify an award to OFI. See Pl.'s Mot. 33 (stating that "DLA's results-oriented approach is apparent in its failure to properly explain why BMMI's proposal does not merit a price premium of less than 10 percent, given that BMMI is rated higher on the two most important factors"). In order to so conclude, the Court would have to find that—despite the narrative in its April award decision—DLA did not actually take into consideration the factors it expressly discussed and purported to analyze in that decision. The Court simply lacks any legitimate basis for making such a finding, which would be inconsistent in any event with the "presumption of regularity" that is generally applied to the government's actions. See Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971); Croman Corp v. United States, 724 F.3d at 1364 (observing that "[g]overnment officials are presumed to 'act conscientiously in the discharge of their duties'") (internal citations omitted); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 720 (2010) ("[P]rocurement officials are entitled to a strong presumption of regularity and good faith."). Absent a showing of bad faith—which BMMI expressly disclaims that it is alleging—the Court must rely upon the written record to discern the bases for the agency's decision to award the contract to OFI.

## CONCLUSION

On the basis of the foregoing, the government's motion for judgment on the administrative record is **GRANTED**. BMMI's motion for judgment on the administrative record is **DENIED**. The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge